EDWARD M. COHON AND ASSOCIATES, LTD., Plaintiff-Appellee, v. FIRST NATIONAL BANK OF HIGHLAND PARK, as Trustee, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—91—2768

Opinion filed June 18, 1993.—Rehearing denied July 22, 1993.

Adler & Adler, of Chicago (Joseph I. Adler and Charles E. Adler, of counsel), for appellants.

Andrea B. Friedlander, of Deerfield, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff-appellee, Edward M. Cohon & Associates, Ltd. (Cohon), an architectural firm, filed a mechanics' lien against defendants-appellants, First National Bank of Highland Park, as trustee under trust number 4172, Imperial Realty Company, and Larry M. Klairmont (Klairmont). Cohon then brought suit to foreclose on his mechanics' lien. Trial ensued, and the trial court found that Cohon's mechanics' lien was valid, that Cohon did not breach the flat fee contract, and that Cohon was entitled to $211,886.01 plus costs. The trial court did not make a finding as to Cohon's *quantum meruit* claim because that count was pled in the alternative. Klairmont appealed.

The issues presented for review are: (1) whether plaintiff's mechanics' lien claim was fraudulent; (2) whether all necessary parties were joined in the action; (3) whether judgment was entered on wrongfully admitted evidence and beyond the pleaded issues; (4) whether the trial court misinterpreted the contract between plaintiff and defendant; and (5) whether there was a basis for judgment against Imperial Realty Company.

Affirmed.

BACKGROUND

In the fall of 1986, Cohon and Klairmont began discussing the redevelopment and utilization of what is known as the Hall Printing plant site which Klairmont was going to acquire. The project was to encompass over four city blocks of existing industrial-type buildings on a land site of approximately 1 million square feet.

Their discussions analyzed the possibilities of rehabilitating some of the existing buildings, demolishing parts of some, and a mixed program to demolish part, rehabilitate part, and build new. As a result of these discussions, they agreed that Cohon would be the project architect.

The area of the site designated for first redevelopment was the area south of Wellington Avenue and north of Diversey Avenue. It was to be utilized for the shopping center (Section 1). The parties continued to exchange ideas and investigate different ideas regarding possible uses for the remainder of the site.

Cohon forwarded an AIA contract (a standard architectural contract) dated September 3, 1986, to Klairmont for execution. Klairmont never executed the contract or stated why it was not signed.

On October 17, 1986, Cohon directed a letter to Klairmont to confirm their agreement of October 16, 1986. Klairmont never responded or denied the content of the letter. Thereafter, Cohon proceeded to work on the project.

Monthly invoices were sent to Klairmont starting in November and December 1986 on Section 1, reciting the base fixed fee, and on Sections 5, 6, 8, and 12, establishing hourly rates and computation of fees earned during the month previous to the invoice date.

Cohon testified that he did not issue monthly invoices to Klairmont for Section 1 at the agreed $20,000-per-month installment pursuant to the provisions of the unsigned AIA contract and the October 17, 1986, letter because he did not want to get ahead of the developer in the progress pace of the shopping center. He billed only for the actual amount of work done.

However, Klairmont testified that he felt his agreement for architectural services with Cohon was very loose. Moreover, Klairmont testified that he did not acknowledge Cohon's letter because he felt that it did not memorialize their agreement. Since he was not sure that the shopping center could be built, he felt that he and Cohon had a conditional agreement and that no compensation would be due Cohon if the shopping center were not completed and a flat fixed fee of $300,000 would be due if the shopping center were built and completed. Klairmont further testified that he never agreed to make monthly payments of $20,000 as the work on the shopping center progressed. Since there was no loan commitment, Klairmont stated that he would pay Cohon what he felt could be paid from the operating revenues of Imperial Realty Company. He further testified that there was no agreement that Cohon would be entitled to the percentages of compensation as set out on page nine of the AIA contract. He felt that if the shopping center did not get built, he and Cohon would discuss compensation for Cohon's efforts.

From November 1986 through June 1987 Cohon did extensive work on Section 1 (shopping center), Section 5 (industrial portion of site), Section 12 (master utility plan), and Sections 6 and 8 (mini

warehouse and basement ramp under the north building of the shopping center for clients' vehicle storage). Through the summer of 1987, to the end of that year, the work continued on these identified areas and, in addition, Section 9 (building 1, Belmont frontage).

Through all of these months of 1986 and 1987, Cohon directed monthly invoices to Klairmont on each of the sections identified based on hourly fees except for the Section 1 shopping center invoices, which reflected the value of services rendered in a particular month relative to the fixed fee basic contract amount of $300,000.

Payments were received from Imperial Realty Company throughout this period and credited to the various invoices. Klairmont acknowledged receiving the invoices and testified that he expressed to Cohon his unhappiness and inability to understand the invoices. On November 27, 1987, Klairmont wrote Cohon complaining that Cohon wanted more money on outstanding invoices. According to the letter, Imperial Realty Company had paid $116,281.45 to date to Cohon out of its operating funds.

Klairmont, in this letter, further acknowledged the agreement to $20,000 per month on the shopping center account and that because a commitment was due on the mini warehouse shortly, ample funds would be available. He testified that he did intend to pay Cohon the $20,000 per month after the loan commitment was received.

During 1988, Cohon continued working on Section 1 (shopping center phase 1) and Section 9 (building 1, Belmont frontage). He completed work on Section 5 (industrial portion of the site), Section 12 (master utility plan), Sections 6, 7, and 8 (the mini warehouse), and Section 10 (the overall lease plan). In mid-1988, he commenced work on Section 11 (the portion of the site identified as the south side of Diversey). Monthly invoices were sent to Klairmont on the sections identified and some payments were received from Imperial Realty Company and credited to various invoices.

Cohon prepared an overall site plan dated January 16, 1989, of the entire project. In March of 1989, his work on Section 11 (south side of Diversey) was concluded. In September of 1989, his work on Sections 2 and 9 (building 1, Belmont frontage, and new tech building) was concluded. During 1989, monthly invoices were sent for the work done on Sections 1 through 5, and 9 through 12. Some payments were received and credited.

However, regarding the shopping center (Section 1), Klairmont wanted Cohon to change the location of two co-anchor tenants. Cohon and Klairmont discussed these changes and Cohon's fees for accomplishing these modifications. This discussion culminated in the letter

Cohon sent Klairmont on July 6, 1989. Cohon testified that he felt the changes to the north and west building of the shopping center were of such magnitude, encompassing over 100,000 square feet and new construction drawings, that this revision required additional compensation. Cohon refused to redo the working drawings without additional compensation, and he ceased working on Sections 1 and 3 (commercial retail phase 1 and Phar-Mor SP-2 plan) in June of 1989.

Cohon consented to Klairmont's engaging the services of another architect for the shopping center project with the understanding that he and Klairmont had an oral agreement that all of Cohon's unpaid invoices would be paid as soon as financing for the shopping center was finalized. Klairmont testified that Cohon was mistaken in his presumption that he would satisfy the outstanding invoices. He stated that he felt that Cohon had been overpaid for the work he had done on the project and that the changes should have been done at no additional charge.

Klairmont next communicated with Cohon by letter dated September 14, 1989, wherein he advised Cohon that the loan had been approved and upon approval of disbursement he would sit down to finalize outstanding invoices. Klairmont testified that Cohon had continued his work on the other areas of the project and his reference to outstanding invoices were those pertaining to areas other than the shopping center.

Cohon's last services as project architect were performed at the end of October or November 1, 1989. On November 16, 1989, Klairmont wrote Cohon, stating that Imperial Realty Company had paid Cohon $385,703.85 to date. Klairmont further enclosed payment of $10,000. He requested that Cohon forward itemization of his billings on each section of the project so he could evaluate the claimed outstanding balances. Klairmont testified that he sent the $10,000 as a good-faith payment gesture because Cohon was asking for further remuneration. Klairmont stated he could not understand the invoices and did not know the status of the various aspects of the project, other than the shopping center.

Klairmont again wrote Cohon on December 14, 1989, after they apparently had had other communications. He advised Cohon that if Cohon desired, they could meet to settle in full. Klairmont testified that he meant a full settlement of whatever was due Cohon. However, he felt that Cohon's work on the shopping center was of no value because Cohon had refused to complete the modifications as needed.

On December 28, 1989, Cohon filed a mechanics' lien on the project property. Klairmont wrote Cohon on January 16, 1990, denying he owed Cohon the amounts claimed.

Pursuant to the trial court's request, Cohon filed a pretrial memorandum outlining the various projects. The accounting indicated that for Section 1 (shopping center phase 1) $148,893 was due. Klairmont paid $78,107 out of $227,000 billed. As for Section 2 (building number 1 Belmont site and new tech building), $60,270 was due. This entailed the development of part of the industrial portions of the property. Cohon considered this to be an additional service and billed at an hourly rate. Defendant did not pay for this work. As for Section 3 (drawing SP-2 for lease attachment to Phar-Mor lease), $2,330 was due. This consisted of changes to drawings on the commercial portion of the property. Cohon billed Klairmont at an hourly rate because he considered this to be an additional service. Klairmont did not pay for this work. As for Section 4 (reimbursables), $393.01 was due for expenses incurred by Cohon in connection with the development of the property. These amounts total $211,886.01. Cohon did not indicate a balance due for Sections 5 through 12.

Shortly before the commencement of Cohon's foreclosure of lien proceedings, Klairmont filed two motions to strike and dismiss the second amended complaint which were denied. In his first motion, Klairmont argued that the mechanics' lien as filed was fraudulent in the amount claimed. The trial court denied that motion. In its judgment and order, the trial court later explained that it denied such motion because a question of fact remained as to whether the mechanics' lien was fraudulent.

The trial court denied the second motion (failure to join a necessary party) and later stated, in its judgment and order, that public notice had been given. The trial court explained that it denied Klairmont's motion because Cohon's lien rights referred back to the date of its contract, Cohon filed the mechanics' lien on December 28, 1989, and that Cohon filed his foreclosure of lien suit on March 2, 1990. The trial court considered that a portion of the *rem* had been conveyed to a different trust at the same bank by a deed recorded April 19, 1990, and that a mortgage encumbrance had been executed by that trust and recorded on May 2, 1990.

The trial court deemed that, based on the evidence, Cohon and Klairmont, in the fall of 1986, entered into an oral contract for Cohon to perform architectural services for the project identified as the redevelopment of the Hall Printing plant. The trial court identified the professional services that were to be performed and the compensation

agreed to as: (1) an overall master plan for the redevelopment of the entire site to be paid on an hourly fee basis billable monthly; (2) industrial and mini warehouse utilization of the site to be paid on an hourly fee basis billable monthly; and (3) the commercial/retail shopping center (phase I) and parking area utilization of part of the site to be paid on a fixed flat fee of $300,000 with a down payment and balance payable monthly.

The trial court concluded that the October 17, 1986, letter memorialized the compensation the parties negotiated for the commercial/retail shopping center phase I portion of the contract from the fee of $1.75 a square foot as proposed in the AIA contract form to the fixed flat fee.

The trial court determined that, based on the evidence, the balance claimed by Cohon for his services on Section 1 ($148,893) and his identification of the unearned amount of the fixed fee contract ($73,000) was fair and reasonable and that the amounts claimed by Cohon for his services on Sections 2 and 3 based on hourly fees were also fair and reasonable. The trial court also awarded Cohon "reimbursables" (Section 4), which was standard in the architectural community.

The trial court found that Cohon had perfected and had proven a valid mechanics' lien in the face amount of $211,886.01 against the interests in the *rem* of defendants First National Bank of Highland Park, as trustee under trust number 4172, Imperial Realty Company, and Klairmont.

OPINION

I

Klairmont first contends that Cohon's mechanics' lien was fraudulent because he overstated the amount due by $62,973.01. We disagree.

Section 7 of the Mechanics Lien Act (Ill. Rev. Stat. 1989, ch. 82, par. 7) provides, in pertinent part:

> "No such lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien therefor under this Act, *unless it shall be shown that such error or overcharge is made with intent to defraud* ***." (Emphasis added.)

Furthermore,

> "the courts of Illinois have held that errors or overcharging by lien claimants will not defeat their claim for lien absent

clear intent to defraud. This principle is in complete accord with the language of the statute above cited and is another corollary to the generally accepted *** principle that fraud is never presumed but must be the subject of clear and convincing proof." *Atlee Electric Co. v. Johnson Construction Co.* (1973), 14 Ill. App. 3d 716, 725, 303 N.E.2d 192.

Klairmont contends that Cohon's claim for a mechanics' lien is fraudulent because the written contract covered only the shopping center phase of the project. Based upon this premise, Klairmont asserts that because Cohon's claim for lien sought compensation for other phases of the project, the lien is necessarily fraudulent and, therefore, invalid.

However, the trial court specifically found that the mechanics' lien was not fraudulent. The trial court based this finding on the scope of the parties' agreement. The court found that the parties' agreement included more than just the shopping center portion of the property. The trial court stated:

> "Based on the evidence the court finds that Cohon and Klairmont, in the Fall of 1986, entered into an oral contract for Cohon to perform architectural services for the project identified as the redevelopment of the Hall Printing Plant. The professional services to be performed and the compensation agreed to therefor were identifiable to three distinct efforts:
>
> 1. Overall master plan for redevelopment of the entire site; on a hourly fee basis billable monthly.
>
> 2. Industrial and Mini Warehouse utilization of part of the site; on a hourly fee basis billable monthly.
>
> 3. Commercial/Retail Shopping Center Phase I and parking area utilization of part of the site; on a fixed flat fee of $300,000.00 with a down payment and balance payable monthly."

The trial court additionally found that the amount claimed in Cohon's mechanics' lien was fair and reasonable.

■ The record contains sufficient evidence to support these findings of fact. Cohon testified that his agreement with Klairmont covered both the shopping center and the nonshopping center phases of the project, and Cohon's October 17, 1986, letter to Klairmont confirmed this understanding. In addition, Cohon testified that he was familiar with the range of fees charged by other architects in the Chicago area for projects similar to this one,. and that the fees he was charging Klairmont were within that range.

Further, the record does not contain any evidence of an intent to defraud which is required to invalidate a mechanics' lien on the basis that the lien overstates the amount owed. In the instant case, the trial court implicitly found that there was no intent to defraud when it found that Cohon's lien was not fraudulent.

The existence of an intent to defraud is a question of fact to be decided by the trier of fact and will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Bailey v. Meador* (1980), 91 Ill. App. 3d 143, 145, 414 N.E.2d 279.

In attempting to prove that an overstatement of an amount due in a mechanics' lien constituted fraud, Klairmont relies on *Fedco Electric Co. v. Stunkel* (1979), 77 Ill. App. 3d 48, 395 N.E.2d 1116. However, the facts in *Fedco* are distinguishable from the case at bar. In *Fedco*, the amount of the lien was over $13,000 more than the amount sought in the lien claimant's complaint, and the lien claimant specifically admitted that he intentionally overstated the amount of his lien because he had previously encountered difficulties receiving payments from the owner. The lien claimant further testified that he failed to credit the owner for payment of $19,220, that he charged the owner $13,500 for work actually done for one of the owner's tenants, he failed to give the owner a credit for approximately $2,500 for various other items, and he double-billed the owner for some work.

In contrast, Klairmont did not prove such discrepancies here. The record contains sufficient evidence to support the trial court's finding that Cohon's claim for mechanics' lien was not fraudulent.

## II

Klairmont next contends that all necessary parties were not joined in Cohon's suit. We disagree.

The pertinent part of section 11 of the Mechanics Lien Act (Ill. Rev. Stat. 1989, ch. 82, par. 11) provides:

> "The plaintiff shall make all parties interested, of whose interest he is notified or has knowledge ***. *** Parties in interest, within the meaning of this act, shall include persons entitled to liens thereunder whose claims are not, as well as are, due at the time of the commencement of suit ***."

Klairmont's argument is founded on his belief that the trial court erred in denying his motion to strike and dismiss for failure to join necessary parties. The basis for Klairmont's motion to strike and dismiss was that Cohon failed to name as party-defendants in the foreclosure lien suit, the trust that acquired title to the property on April

19, 1990, and the lending institution that recorded a mortgage against the property on May 2, 1990.

However,

"[t]he rule is, that one who acquires title to property during the pendency of a suit to foreclose a mortgage is bound by the decree in the foreclosure suit and takes the property subject to any judgment or decree which may be then rendered." (*Kemper v. Weber* (1925), 318 Ill. 494, 498, 149 N.E. 478.)

The *Kemper* court continued:

"It was not necessary that plaintiffs in error, who were purchasers *lis pendens*, be made parties to the proceeding pending at the time they acquired their deeds to this property. Such a purchaser has a right to appear if he deems it proper and urge in the name of his grantor any defense against the pending proceeding which his grantor has failed to make." *Kemper*, 318 Ill. at 498, 149 N.E. 478.

■ Both of the alleged necessary parties acquired their interests in the property during the pendency of Cohon's foreclosure suit. Cohon filed a mechanics' lien on December 28, 1989, and filed his foreclosure suit on March 2, 1990. The trust did not acquire title to the property until April 19, 1990. The mortgage lender did not record its mortgage against the property until May 2, 1990. The fact that Cohon subsequently amended his claim for lien on August 14, 1990, to correct a typographical error (Cohon changed the completion date from November 1, *1987*, to November 1, *1989*) and amend his complaint does not change the date on which the foreclosure suit was filed or affect the notice given by virtue of this filing. The trial court correctly stated:

"Public notice had been pronounced of the claim the plaintiff was making against the rem and the named parties. Third parties that subsequently acquire an interest do so at their peril and subject to notice."

## III

Klairmont next contends that the trial court entered judgment on wrongfully admitted evidence and claims that were not pled. We disagree.

In determining relevancy, the trial court must consider the evidence in the light of factual issues raised by the pleadings, and it is not error to exclude testimony that has no bearing on the specific issues under consideration. (*Schneiderman v. Kahalnik* (1990), 200 Ill. App. 3d 629, 635-36, 558 N.E.2d 334.) The determination of what is

relevant is within the trial court's discretion, and reversal of its decision is not warranted absent an abuse of that discretion. *Schneiderman*, 200 Ill. App. 3d at 636, 558 N.E.2d 334.

Klairmont asserts that Cohon's complaint was based upon the AIA contract and that this contract was limited to the shopping center phase of the project. Klairmont further contends that evidence on any of the other phases of the project was irrelevant and should not have been admitted into evidence.

The evidence relating to the nonshopping center phases of the project constituted relevant evidence. The October 17, 1986, letter which Cohon sent to Klairmont made reference to the AIA contract as well as the other sections of the project:

"Dear Larry [Klairmont]:

This letter will confirm our agreement reached yesterday on fees pending the formal signed contract which your attorney is going over. For Phase 1 of the retail/commercial of approximately 200,000 square feet, our fee will be a straight $300,000.00. For any and all work that we do at this time for the 'industrial' part, our fee will be on an hourly basis as per the hourly schedule set forth in the contract. This also includes investigation and field measuring of the place.

As per your request, we would like the fee payment on the hourly portion put on a due and payable billing basis during the month following completion of the work. On the basic contract, the initial payment of $25,000.00 is due and payable November 1, 1986 and the balance will be due and payable on a month basis of $20,000.00 per month. These monthly payments will commence January 1, 1987 and run until paid in full, which will run through 1987 and the beginning of 1988. This should give you the spread that you would like in regard to our payments."

The trial court made a specific finding of fact that the parties' oral agreement covered all of the phases of the project on which Cohon introduced evidence. There were 12 sections, Cohon worked on these sections, and different payment methods were required for each. Moreover, the October 17, 1986, letter coupled with the unexecuted AIA contract set forth the agreement. The record is devoid of any demonstration that the trial court predicated its findings on irrelevant evidence.

## IV

Klairmont next contends that the trial court erred in finding that Cohon did not breach its flat fee contract. We disagree.

A trial court's construction of an oral agreement between the parties will be followed unless it is against the manifest weight of the evidence and an opposite conclusion is clearly warranted. *Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 612, 381 N.E.2d 423, *cert. denied* (1979), 444 U.S. 844, 62 L. Ed. 2d 57, 100 S. Ct. 88.

Klairmont asserts that Cohon breached the flat fee agreement by refusing to redo, without additional compensation, working drawings covering over 100,000 square feet of shopping center space to enable the two anchor tenants to switch locations.

The trial court specifically considered Cohon's refusal to redo the construction drawings:

"Location changes of the major co-anchor tenants Phar-Mor and Child World in the Shopping Center caused Cohon to cease his work on Section 1 and 3, Commercial Retail Phase 1 and Phar-Mor SP-2 plan in June of 1989. Cohon and Klairmont had discussions about these changes and the fees Cohon wanted to accomplish these modifications which culminated in the letter Cohon sent Klairmont on 7/6/89 (Plaintiff Exhibit 5). Cohon felt the changes to the North and West buildings of the Center were of such a magnitude, encompassing over 100,000 square feet and new construction drawings, that this revision required additional compensation as was the custom of the architecture profession and, specifically provided for in the standard AIA contract."

■ The evidence is undisputed that Cohon agreed to a flat fee for his work on the shopping center phase of the project with the understanding that the terms of the AIA contract governed the parties' relationship. Section 1.7.12 of the AIA contract specifically provides that the type of revisions requested by Klairmont constituted "Additional Services" which were not part of Cohon's flat fee under the contract. Section 1.7.12 provides that "Additional Services" include:

"Making revisions in Drawings, Specifications or other documents when such revisions are inconsistent with written approvals or instructions previously given, are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or are due to other causes not solely within the control of the Architect."

The requested change to the working drawings to accommodate the anchor tenants' change in location was a cause "not solely within the control of the Architect." Therefore, Cohon's refusal to redo the working drawings as part of his flat fee cannot be considered a breach of the parties' agreement.

## V

Klairmont finally contends that there is no basis for judgment against Imperial Realty Company. The basis for this contention was the record was devoid of any proof or testimony that Imperial Realty Company was a party to the agreement with Cohon. We disagree.

The question of the intent of the parties in connection with an oral contract is a question of fact to be determined by the trier of fact. *Panko v. Advanced Appliance Service* (1977), 55 Ill. App. 3d 301, 304, 371 N.E.2d 3.

The trial court made a specific finding of fact that Imperial Realty Company was a party to the contract with Cohon:

"Mr. Klairmont was acting individually as agent for or on behalf of his alter ego, Imperial Realty Company, which defendants' answer identified as a corporation but Mr. Klairmont testified to as being his sole proprietorship ***."

■ The record supports this finding. Klairmont testified that he was the owner of Imperial Realty Company and all of the correspondence, with one exception, from Klairmont to Cohon was written on Imperial Realty Company's stationery and was signed "IMPERIAL REALTY COMPANY," with the name "Larry M. Klairmont" underneath the company's name.

As the record contains sufficient evidence to support all of the trial court's findings, none of which were against the manifest weight of the evidence, the trial court did not err in entering judgment against the defendants.

Judgment affirmed.

GORDON, P.J., and McNULTY, J., concur.